## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

In the Matter of Three Search Warrants

NO. <u>3:24mj1132  RAR</u> (    )

**Filed Under Seal**

## OMNIBUS AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Erica L. Baranski, having been first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AFFIANT BACKGROUND

1.    I am an Investigator with the New York State Police and Task Force Officer with the Federal Bureau of Investigation (FBI). I have been employed by the New York State Police since September 2019 and the FBI since September 2024. I am assigned to the Albany Division, Albany, NY. I have investigated a variety of crimes, including in the areas of child exploitation, human trafficking, weapons possession, and narcotics. My current duties include investigating criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography in violation of 18 U.S.C. § 2252A. I have received extensive training in the area of child sexual exploitation and have observed and reviewed numerous examples of child pornography in all forms of media including computer media.

2.    I am "a federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal was and duly authorized by the Attorney General to request a search warrant.

3.    I am investigating Taiel D. Gookool ████ B ████) ("Gookool") for violating the following federal laws: 18 U.S.C. § 2251(a) (sexual exploitation of a child), 18 U.S.C.

§ 2252A(a)(2) (receipt and distribution of child pornography), and 18 U.S.C. § 2423(b) (travel with intent to engage in illicit sexual conduct) (the "Target Offenses").

4.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search: (A) the person of Gookool, as specifically described in **Attachment A-1**, (B) the premises located at                          Stratford, Connecticut 06614 (the "Target Premises"), as specifically described in **Attachment A-2**, and (C) a blue 2005 Dodge Caravan                          (the "Target Vehicle"), as specifically described in **Attachment A-3**, and the content of computers and storage media located therein and thereon, for contraband, evidence, fruits, and instrumentalities of violations of the Target Offenses, more specifically described in **Attachment B**.

5.      As described more fully below, there is probable cause for the requested warrants.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrants. It does not set forth all my knowledge about this matter.

## TARGET OFFENSES

7.      As noted above, this investigation concerns alleged violations of the following:

a.      18 U.S.C. § 2251(a), which provides in relevant part: "Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be

punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed [shall be guilty of a crime.]"

      b.    18 U.S.C. § 2252A(a)(2), which provides in relevant part: "Any person who . . . knowingly receives or distributions . . . any child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer [shall be guilty of a crime]."

      c.    18 U.S.C. § 2423(b), which provides in relevant part: "A person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, with intent to engage in any illicit sexual conduct with another person [shall be guilty of a crime]."

## PRIOR RELATED APPLICATIONS

## **PROBABLE CAUSE**

### **Overview of Investigation**

9.     On November 23, 2024, a parent of Minor Victim 1, a female born in 2010 whose identity is known to law enforcement, contacted the NYSP in Catskill, NY to report a sexual assault of Minor Victim 1 by a then unknown adult male going by the name "Rollay" that had occurred on the same date.

10.     On or about November 27, 2024, investigators interviewed Minor Victim 1. During the interview, Minor Victim 1 said, in sum and substance and as relevant to this application, that she was at a residence located in Athens, New York with Minor Victim 2, a female born in 2012 whose identity is known to law enforcement, and Minor Victim 3, a female born in 2012 whose identity is known to law enforcement. Minor Victim 1 explained further that she had been communicating on Snapchat as [           ] with user [           ] in the early morning hours of November 23, 2024, and that she had shared her location with that user. Minor Victim 1 said initially that she had met [           ] via Snap's Common Friends feature but also said she met him through Minor Victim 4, a female born in 2009 whose identity is known to law enforcement and who is discussed further below. According to Minor Victim 1, Gookool picked up her, Minor Victim 2, and Minor Victim 3 at approximately 4:30 a.m. in the morning in a minivan she described consistently with the Target Vehicle. Minor Victim 1 said that Gookool drove around and parked at a nearby drive-in movie theater located in Coxsackie, NY on 9W, at which point Minor Victim 1 said she could not recall any further details.

11.     On December 16, 2024, a child adolescent forensic interview of Minor Victim 1 was conducted. In sum and substance and as relevant to this application, she said that the first time she engaged in sexual activity with Gookool was in or about September 2024, that Gookool provided her alcohol and encouraged her to engage in sex acts with him, and that Gookool instructed her to record certain sex acts with him using her cellular phone and to appear on camera as if she were enjoying the sexual activity. Gookool also took Minor Victim 1's cellular phone at that time and saved the videos in the Notes application on Minor Victim 1's cellular phone. Minor 1 Victim 1 was shown a picture of Gookool from the Connecticut Sex Offender registry, and she confirmed that that was the person with whom she engaged in sexual activity. Minor Victim 1 said she did not tell Gookool her age, that Gookool told her he was 18 years old, and that she does not know if Minor Victim 2 or Minor Victim 3 told Gookool their respective ages in connection with the activity in November 2024, but she said Minor Victim 2 and Minor Victim 3 were using Minor Victim 1's cellular phone to chat with Gookool in the early morning hours of November 23, 2024, before he arrived in New York.

12.     On or about November 26, 2024, investigators interviewed Minor Victim 2 and Minor Victim 3. In sum and substance and as relevant to this application, Minor Victim 2 confirmed that an adult male – known to her as "Rael" but believed to be Gookool – picked up herself, Minor Victim 1, and Minor Victim 3, drove around, and then parked at the drive-in. She described the vehicle as a light blue van with captain seats and a bench-style third row (also consistent with the Target Vehicle). Minor Victim 2 described Gookool as having a tattoo on his shoulder that went down his arm. Minor Victim 2 disclosed that Gookool engaged in sexual acts with Minor Victim 1 at the parking lot inside his van. She said further that Minor Victim 1 recorded the sexual encounter on Minor Victim 1's cellular phone. Minor Victim 2 claimed not to have

engaged in any sexual acts with Gookool. Minor Victim 3 disclosed, in sum and substance and as relevant to this application, a similar account of being driven to the drive-in parking lot by Gookool with Minor Victim 1 and Minor Victim 2. She described the van in a similar fashion as Minor Victim 2 and Gookool as a black male with dreads. She said that Gookool not only had sex with Minor Victim 1 but also forced her (*i.e.*, Minor Victim 3) to perform oral sex on him and digitally penetrated Minor Victim 2's vagina.

13.     On or about November 26, 2024, during a cursory search of Minor Victim 1's cellular phone with the consent of Minor Victim 1's parent, NYSP located the                   Snapchat account and contacts within that account for                   and

14.     New York State Police Troop F subsequently conducted a forensic examination of Minor Victim's 1 cellular phone with the consent of Minor Victim 1's parent. During forensic analysis of Minor Victim 1's cell phone, NYSP's Troop F Computer Crime Unit extracted multiple videos depicting Minor Victim 1 and Gookool engaged in sexual conduct. Below is a sample representation of the videos recovered by Troop F Computer Crime Unit.

   a.     [REDACTED]43858800.mov is a video depicting Minor Victim 1 being subjected to performing oral sex on the penis of an adult male believed to be Gookool.

   b.     [REDACTED]true&cap=t.mp4   is a video depicting Minor Victim 1 being subjected to having sexual intercourse with an adult male. The adult male in the video was positively identified through interviews, criminal history, and sex offender registry photos as Gookool.

15.     On or about November 27, 2024, investigators interviewed Minor Victim 5, a female born in 2010 whose identity is known to law enforcement. She stated, in sum and substance and as relevant to this application, that she was introduced to Gookool by Minor Victim 1 who

gave Minor Victim 5's phone number and Snapchat handle to Gookool. She said that, in or about the Summer of 2024, she had shared her location with Gookool via Snapchat, Gookool picked her up in Hannacroix, NY, drove to a location near Minor Victim 1's residence and picked up Minor Victim 1, and then drove to a nearby store. Minor Victim 5 said that Gookool offered them alcohol, and Minor Victim 1 engaged in sexual activity with Gookool outside of his vehicle while Minor Victim 5 stayed inside the vehicle. Minor Victim 5 said further that Gookool then got into the backseat of his vehicle naked and asked Minor Victim 5 to join him and take her clothes off. Minor Victim 5 then had sexual intercourse with Gookool in the vehicle. Gookool asked if he could record them, but Minor Victim 5 declined. Minor Victim 5 said, however, that she observed Gookool recording himself engaged in sexual activity with Minor Victim 1 multiple times that night and sent the videos to Minor Victim 1 the following day, which she observed.

16.     On or about December 5, 2024, investigators interviewed Minor Victim 4. In sum and substance and as relevant to this application, she said she met up with Gookool on November 3, 2024, after conversing with him on Snapchat with Gookool using the username. Gookool picked Minor Victim 4 up in his van near her residence located in Purling, NY and drove to a nearby CVS in Cairo, NY, where they engaged in sexual activity. During sexual activity, Gookool asked Minor Victim 4 for her cellphone, took it from her, and used it to record Minor Victim 4 performing oral sex on him and having sexual intercourse with him. Minor Victim 4 said that, after they left the parking lot, Gookool asked her to Snap the videos to his account, which she did. A preliminary search of Minor Victim 4's cellular phone with the consent of her parent identified her Snap account as and showed Snaps with Minor Victim 1, and group messages among them. It also revealed videos

of Minor Victim 4 engaged in oral and vaginal sex with an adult male matching Gookool's appearance inside what appears to be the Target Vehicle.

17.     Gookool is a registered sex offender in Connecticut and has prior convictions in 2018 for violating Conn. Gen. Stat. § 53a-71(a)(1) (Sexual assault in the second degree), which provides that "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than three years older than such other person," and in 2020 for violating Conn. Gen. Stat § 53-21(a)(2) (Injury or risk of injury to, or impairing morals of, children), which sets forth an offense for "Any person who . . . has contact with the intimate parts . . . of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual manner likely to impair the health or morals of such child[.]" According to Gookool's criminal history report, it appears that he was most recently released from prison in or about 2022 after serving approximately 28 months on a probation violation.

## Identification of the Subject Premises, Vehicle, and Gookool

18.     On or about November 27, 2024, a TLO search[1] was conducted on phone number ▮▮▮▮292 (provided by Minor Victim 5 during her interview to be Gookool's phone number). That returned subscriber information for Gookool and an address of the Target Premises.

19.     On December 11, 2024, FBI Albany served an administrative subpoena to Optimum for login IP addresses associated with Gookool's Snapchat account. The response from the

---

[1] TLO refers to a database that can be searched by law enforcement, government agencies, and others for investigative and risk management purposes. *See* https://www.tlo.com/law-enforcement (last visited December 16, 2024).

subpoena showed a subscriber believed to be Gookool's brother, with a service address of the Target Premises.

20.     On or about December 16, 2024, I checked the Connecticut Sex Offender Registry, which listed the Target Premises as Gookool's residence.

21.     On December 11, 2024, FBI conducted a DMV search of Gookool which returned the Target Vehicle as registered to him. The Target Vehicle appears consistent with the descriptions provided by the victims of the vehicle they observed being driven by Gookool and used by Gookool to engage in sexually explicit conduct with the victims.

22.     On December 10, 2024, FBI Albany conducted a vehicle detection report for the Target Vehicle. License plate readers identified it in the early morning hours of November 23, 2024, heading Westbound in Brewster, NY, consistent with the route and timeframe from the Target Premises to Athens, NY as disclosed by Minor Victim 1.

23.     On December 14, 2024, FBI New Haven conducted physical surveillance at the Target Premises. It is a ranch style home with a red brick exterior and white front door, a separate side entrance, and a detached garage with red siding and a white door. The Target Vehicle was observed in the driveway.

24.     There is probable cause to believe that Gookool, rather than the adult male that is the subscriber of Optimum account, is responsible for committing the Target Offenses because Gookool has already committed similar crimes, is currently registered as a sex offender with the State of Connecticut, is the registered owner of the Target Vehicle, and is identifiable in media recovered from one of the victim's cell phones.

**Characteristics of People who Sexually Exploit
Children and Create and Receive and Distribute Child Pornography**

25.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to individuals who sexually exploit children and distribute and receive child pornography. As described below and above, there is reason to believe that Gookool shares these characteristics, that he is engaged in similar activity as these individuals, and that he is engaged in sexual exploitation of children and receiving and distributing child pornography.

a.     Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have while viewing children engaged in sexual activity or in sexually suggestive poses, whether in person, in photographs or other visual media, or from literature describing such activity.

b.     Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.     Such individuals may use the internet and cloud storage to allow them to obtain and store the material in relatively secure and anonymous way. However, individuals who have a sexual interest in children or images of children will also often maintain their digital or electronic collections in a safe, secure and private environment on a physical device, such as a computer, flash drive, or cell phone, as well as in the cloud. These collections are often maintained for several years and are kept close by, usually at the collector's residence, vehicle, or on their

person, to enable the individual to view the child pornography images, which are valued highly. These items may contain computer storage media, a notebook with computer passwords or other related evidence, and paperwork associated with the purchase of a computer device. Further, such individuals often move contraband between and among various computers and storage media either to organize / curate their collections and/or because the collections are too large to keep on a single device. Thus, I believe there is probable cause to believe that Gookool will have child pornography on computers and storage media kept within the Target Premises and/or on his person and within the Target Vehicle.

    d.  Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis; however, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

    e.  Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

    f.  Such individuals may prefer not to be without their child pornography for any prolonged period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Thus, even if a person uses a

portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in the person's home.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

26.    As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information concerning the Subject Offenses in whatever form they are found, including on computers and storage media. Thus, the warrant applied for would authorize the seizure of such devices or, potentially, the copying of electronically stored information.

27.    *Probable cause.* I submit that if a computer or storage medium is found during the authorized searches there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

28.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer and/or storage medium found during the authorized searches because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the

times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on

a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

      f.     I know that when an individual uses a computer it will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

     29.     Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

      a.     *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of

how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.    *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.    *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

30.    *Nature of examination*. Based on the foregoing, and consistent with Rule 41I(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium,

that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

31.     Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

32.     Because there is a potential for several people sharing the Target Premises, it is possible that it will contain computers and/or storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. The warrant applied for would permit the seizure and review of those items because anyone within the Target Premises with access to such devices could still have used them to commit the Target Offenses, or evidence of the Target Offenses might otherwise be included on them by, for example, showing that a particular device

was not or could not have been used to commit the Target Offenses, thus ruling out a potentially culpable third-party as the perpetrator.

## **BIOMETRIC ACCESS TO DEVICES**

33. This warrant permits law enforcement to compel Gookool to unlock any electronic devices requires biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that may electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the

user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

       d.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with their irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers their irises by holding the device in front of their face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

       e.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

       f.     As discussed in this affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices,

making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 48 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

34.     Due the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Gookool to the fingerprint scanner of the devices found at the Target Premises, the Target Vehicle, or on his person; (2) hold the devices found at the Target Premises, the Target Vehicle, or on his person in front of the face of Gookool and activate the facial recognition feature; and/or (3) hold the devices found at the Target Premises, Target Vehicle, or on his person in front of the face of Gookool and active the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

The proposed warrant does not authorize law enforcement to compel Gookool to state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel Gookool to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

35.    Based on the foregoing, there is probable cause to believe that the contraband, property, evidence, fruits, and instrumentalities of the Target Offenses, more fully described in Attachment B, are located at the locations described in Attachment A-1, Attachment A-2, and Attachment A-3. I respectfully request that this Court issue: search warrants for the locations described in Attachment A-1, Attachment A-2, and Attachment A-3, authorizing the seizure and search of the items described in Attachment B.

36.    I am aware that the recovery of data by a computer forensic analyst takes significant time, much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence also will undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the Target Premises, Target Vehicle, or Gookool's person. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

37.    *Sealing.* It is respectfully requested that this Court issue an order sealing this Affidavit and Application for four months. I believe that sealing is necessary because the items and information to be seized are relevant to an ongoing investigation. Premature disclosure of the contents of these documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

_Erica L. Baranski_
Erica L. Baranski
Task Force Officer
Federal Bureau of Investigation

The truth of the foregoing affidavit has been attested to me by FBI TFO Erica L. Baranski over Teams on December 17, 2024

Phone

_Rbt A. R._
HON. ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

# Exhibit 1



















































## ATTACHMENT A-1
*Person and Property to be Searched*

The property to be searched is the person of TAIEL D. GOOKOOL, an adult male born in 1994, whose picture is depicted below, provided he is located within the District of Connecticut at the time of the search, and all clothing and personal belongings, backpacks, briefcases, purses, and bags within his immediate vicinity and control when the search warrant is executed, and computers or storage media found during said search.



**ATTACHMENT A-2**
*Property to be Searched*

The property to be searched is ▮▮▮▮▮▮e▮▮▮, Stratford, CT 06614 including any garages (whether attached or unattached) and any outbuildings on the property, and computers or storage media found during said search. The Property is depicted below:



## ATTACHMENT A-3
*Vehicle to be Searched*

A 2005 Dodge Caravan ▮▮▮▮▮▮▮▮▮▮▮ depicted below, and computers or storage media found during said ▮▮▮



## ATTACHMENT B

### Property to be Seized

All property, records, and information, in any format, that constitutes evidence of the commission of one or more of the following criminal offenses, contraband, the fruits of crime, or property designed or intended for use or that is or has been used as a means of committing one or more of the following criminal offenses, namely violations of 18 U.S.C. § 2251(a) (sexual exploitation of a child); 18 U.S.C. § 2252A(a)(2) (receipt and distribution of child pornography); and/or 18 U.S.C. § 2423(b) (travel with intent to engage in unlawful sexual conduct) (collectively, the "Target Offenses").

1.  In any format or media, all originals, copies and negatives of child pornography and/or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(8);

2.  Child erotica;

3.  Computers or storage media that could be used as a means to commit the Target Offenses, and/or on which the things described in this warrant could be stored;

4.  Routers, modems, and network equipment used to connect computers to the Internet;

5.  Records, information, and items relating to violations of the Target Offenses in the form of:

    a.  Records and information referencing child pornography, as defined in 18 U.S.C. § 2256(8);

    b.  Records and information referencing child erotica;

    c.  Records and information referencing or revealing the Target Offenses, to include the identity of the individuals involved and location of occurrence;

    d.  Records and information referencing or revealing a sexual interest in children or the sexual exploitation of children, to include the identity of the individuals involved and location of occurrence;

    e.  Records and information referencing or revealing communication or interaction concerning the Target Offenses, to include the identity of the individuals involved and the location of occurrence;

    f.  Records and information referencing or revealing participation in groups or use of services to facilitate the Target Offenses, including evidence of use of Snapchat and the ███████ username;

g. Records and information referencing or revealing the use of remote computing services for the Target Offenses such as email, cloud storage, or online social services.

6. For any computer or storage medium whose seizure is authorized by this warrant (hereinafter "COMPUTER"):

 a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, deleted, viewed, or otherwise interacted with such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

 b. evidence of how and when the COMPUTER was used to create, edit, delete, view, or otherwise interact with or engage in the things described in this warrant;

 c. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

 d. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

 e. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

 f. records or information about the Internet Protocol addresses used by the COMPUTER;

 g. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

 h. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

 i. evidence of the lack of such malicious software;

 j. evidence of computer programs (and associated data) that are designed to eliminate data from the COMPUTER; and

        k.      evidence of using mobile applications, such as Snapchat, to communicate concerning the Target Offenses.

7.     Records, information, and items relating to violations of the Target Offenses above including:

        a.      Records, information, and items relating to the occupancy or ownership of the Target Premises, including utility and telephone bills, mail envelopes, or addressed correspondence;

        b.      Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

        c.      Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

Because multiple people may share the Target Premises as a residence, it is possible that the Target Premises will contain storage media that are predominantly used, and perhaps owned, by a person who is not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.